

FILED
FEB 18 2020
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:20cr022 |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Commit Wire and Bank Fraud |
| PATRICK LINDSEY, | ) | (Count One) |
| | ) | |
| *Defendant.* | ) | Forfeiture Notice |
| | ) | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

1. Morton G. Thalhimer, Inc. ("Thalhimer") was a commercial real estate firm, doing business as Cushman & Wakefield/Thalhimer, with its principal place of business in Glen Allen, Virginia. Founded in 1913, Thalhimer provided real estate services for commercial and residential multi-family properties, including both property management and development, construction and project management of properties located in Virginia, North Carolina, and South Carolina.

2. Thalhimer had four wholly-owned subsidiaries: MGT Construction Management ("MGT Construction" or "MGT"), Thalhimer Realty Partners, Inc., Thalhimer Sullivan, L.L.C., and Thalhimer Copty Real Estate L.L.C.

3. Thalhimer established MGT Construction in 1988 as a wholly-owned subsidiary, and as a Virginia corporation with its principal place of business in Richmond, Virginia. MGT was a construction company that offered preconstruction planning and evaluation, design-build,

and construction management services for Thalhimer owned and/or managed properties, as well as other entities.

4. MGT initially focused on tenant improvement projects, but beginning in or about 2012, MGT expanded its business to include larger construction projects. MGT Construction's revenues more than doubled from approximately $14.5 million in 2011 to approximately $35.1 million in 2012. In 2013, MGT Construction's revenues increased to $43.6 million. And by 2014 and 2015, MGT Construction's revenues grew to approximately $56 million and $63.5 million, respectively.

5. Thalhimer's management team between 2011 and 2016 included a number of executives who served as officers of both Thalhimer and that company's MGT Construction subsidiary.

6. The defendant, Patrick Lindsey ("LINDSEY"), was hired at MGT Construction on or about January 1, 2007 as an estimator. In early 2013, LINDSEY became Vice President of Preconstruction Services. LINDSEY served in that capacity until Thalhimer terminated his employment on or about November 15, 2016.

7. Between 2011 and 2018, MGT Construction purportedly used the percentage-of-completion accounting method to recognize revenues and expenses for its construction projects. The percentage-of-completion method allows a company to recognize as income that percentage of total income that matches the percentage of completion of a project in every accounting period in which the project continues to be active. This is in contrast to the completed contract method, which defers the reporting of income and expenses until a project is completed. The percentage-of-completion accounting method is common in the construction industry.

8. During this same time period, MGT Construction also prepared regular Work In Progress (or "WIP") reports. A WIP report is an accounting schedule that is a component of a company's balance sheet. Generally Accepted Accounting Principles (or "GAAP") require companies that use percentage-of-completion accounting to maintain a WIP report for each accounting period. Though the format of a WIP report varies, it usually includes current period and project-to-date financial metrics that detail each individual project.

9. During this same time period, MGT Construction used an accounting software program named Timberline. LINDSEY and other MGT employees entered data into Timberline related to the revenue and expenses for all MGT projects, including invoices, change orders, and payments from property owners. Both MGT and Thalhimer employees had access to the Timberline system, and used the software to produce WIP reports and other documents that detailed the financial status of both individual projects, and MGT as a company.

10. Senior MGT employees, such as LINDSEY, enjoyed financial compensation packages that included both their MGT salaries, and an incentive bonus structure that consisted of cash payments tied to a percentage of MGT's annual profits.

## COUNT ONE
(Conspiracy to Commit Wire and Bank Fraud)

11. The allegations in paragraphs 1 through 10 of this Criminal Information are re-alleged and incorporated as though set forth in full here.

12. From in or about 2011 through in or about November 2016, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, the defendant, PATRICK LINDSEY, knowingly and intentionally combined, conspired, confederated and agreed with others known and unknown to commit offenses against the United States, to wit:

    a. Wire Fraud, that is, to devise a scheme or artifice to defraud or obtain money and property by materially false or fraudulent pretenses, representations, or promises, and that in advancing, furthering, or carrying out that scheme or artifice to defraud, did transmit or caused to be transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce, in violation of Title 18, United States Code, Section 1343; and,

    b. Bank Fraud, that is, to knowingly execute a scheme to defraud a financial institution (as that term is defined at Title 18, United States Code, Section 20) by means of material false or fraudulent pretenses, representations or promises, with the intent to deceive that financial institution and to obtain money owned by and under the control of that financial institution, in violation of Title 18, United States Code, Section 1344.

13. The object of the conspiracy was for LINDSEY, and others known and unknown, to conceal the true financial condition of MGT Construction to ensure that LINDSEY and his co-conspirators maintained their positions of control; continued to personally profit from their salaries; and continued to receive numerous other benefits from their positions, to include the receipt of cash bonuses based on (purported but non-existent) company profits; ownership interests in certain Thalhimer real estate projects; the ability to employ family members and friends; and the use of MGT resources and funds to renovate or improve their personal properties at greatly reduced cost.

14. During the course of the conspiracy, and as described in more detail below, LINDSEY and his fellow conspirators performed numerous overt acts in order to further the objective of their agreement, to include completing fraudulent accounting manipulations; making

misrepresentations or deliberate and material omissions when dealing with audit companies engaged in reviewing MGT's financial condition; and submitting fraudulent financial statements to financial institutions and insurance companies in order to obtain loans, lines of credit, and insurance coverage.

### The Ways, Manner, and Means of the Conspiracy

The ways, manner, and means by which LINDSEY and his fellow conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

15. WIP reports were a significant measure of MGT Construction's financial condition. These reports – generated in MGT's Timberline accounting software program – supposedly provided up-to-date snapshots of the status of each of MGT's various construction projects, to include the percentage of physical construction completed to date; MGT's budgeted cost estimate for the project; the actual costs incurred to date; and the remaining anticipated costs. The WIP reports also indicated the profit (or loss) percentage that MGT Construction could expect based on that ratio of physical progress to outstanding costs.

16. The "costs incurred" category consisted primarily of invoices submitted to MGT by the various sub-contractors and vendors employed by MGT on any particular project. Simply put, if the total amount due and owing from those accumulated invoices amounted to *less* than the sum that MGT had budgeted for that particular construction project, the project had turned a profit for MGT Construction (and by extension, Thalhimer). If, on the other hand, MGT Construction owed *more* in total invoices than MGT had budgeted for that project, MGT (and by extension, Thalhimer), had lost money. The Timberline-generated WIP reports thus provided MGT and Thalhimer management with a current, evolving picture of the construction subsidiary's profitability.

17. MGT and Thalhimer management relied on those WIP reports to demonstrate MGT's profitability to financial institutions and bonding companies when seeking loans, lines of credit, and construction bonds. Financial statements that reflected a consistently profitable construction company were more likely, of course, to convince financial institutions to provide MGT Construction with the financial backing the Company needed to pursue, acquire, and complete new construction projects.

18. While acting at the direction of his co-conspirators, LINDSEY became largely responsible for ensuring that MGT's WIP reports portrayed MGT's various construction projects as – by and large – profitable endeavors. Beginning in approximately 2011, the exact date being unknown, LINDSEY assumed primary responsibility at MGT Construction for the physical, day-to-day management of a large-scale, long-running fraudulent accounting scheme that LINDSEY and his fellow conspirators operated to conceal the fact that many of MGT's construction projects were returning *losses* – not profits – to MGT and its parent company, Thalhimer.

19. The primary means by which LINDSEY and others concealed the true nature of MGT's profitability involved the calculated movement of invoices within MGT's Timberline accounting system.

20. LINDSEY would review WIP reports on at least a monthly basis, typically at the end of each month. LINDSEY would both provide those WIP reports to others at MGT, and/or advise his fellow conspirators of the substance of those WIP reports, to include the status of the percentage of profit (or loss) that MGT could expect.

21. As MGT projects approached completion, the monetary difference between the categories of "costs incurred" and "estimated costs" (that is, MGT's *budget* for the project) would naturally narrow as more sub-contractors and vendors completed their portions of the project, and

6

submitted their invoices to MGT for payment. When the "costs incurred" would approach and eventually overrun MGT's allotted budget for the project, an accurate WIP report for that project would reflect a shrinking, vanishing "percentage of profit" category.

22. When the WIP reports reflected that particular projects were on the verge of becoming unprofitable (or less profitable than MGT initially estimated), LINDSEY would be instructed to remove one or more invoices from the particular project, and transfer those invoices to other MGT projects within the company's Timberline accounting system. LINDSEY would typically move invoices from projects that were approaching completion (e.g., 75% completed) to projects in the initial stages of construction (e.g., 20% completed), where those added costs would not imminently threaten MGT's predicted profit margin.

23. As a result of LINDSEY's accounting manipulations, the *revised* WIP report would reflect an inaccurate, fraudulent profitability figure – one that both concealed the losses on that nearly-completed job, and simultaneously inflated MGT's net income on that job. LINDSEY and his co-conspirators understood that this inflated profitability figure was material to the financial institutions and bonding companies on whose lines of credit and insurance coverage MGT and Thalhimer depended.

24. As the scheme progressed, LINDSEY and his fellow conspirators were required to increasingly manipulate invoices within the Timberline accounting system to ensure that nearly-finished projects reflected acceptable (albeit fictitious) profit margins.

25. In order to keep the fraudulent accounting scheme from being discovered, LINDSEY and his co-conspirators understood the necessity of always having newer, recently-initiated construction projects in MGT's pipeline. Without those newer projects, there would be nowhere in Timberline for conspirators to transfer job costs.

26. This necessity for continued accounting manipulation meant that MGT operated under the perverse incentive of acquiring new projects at any cost – even if that required MGT to submit deliberately under-valued project estimates in order to ensure that MGT would under-bid other construction firms when competing for new projects.

27. As noted above, LINDSEY and his fellow conspirators submitted the products of these accounting manipulations – such as the revised WIP reports that reflected grossly inaccurate snapshots of MGT's profitability – knowing they would serve as part of MGT / Thalhimer's application packages to financial institutions, such as SunTrust Bank, PNC Bank, Fulton Bank, and BB&T Bank, when seeking construction loans, or new or increased lines of credit. MGT / Thalhimer would also submit these fraudulent financial representations to bonding companies, such as The Hartford, when seeking business insurance coverage of MGT's construction projects.

28. Those fraudulent financial statements would be sent by MGT / Thalhimer to these financial institutions and insurance companies as attachments to email communications. Those email communications to the financial institutions and insurance companies necessarily utilized servers located outside of the Commonwealth of Virginia.

29. Over the course of the conspiracy, LINDSEY and his co-conspirators caused the following overt acts, among others, to be committed in furtherance of the conspiracy and to effect the objects of the conspiracy:

   a. On or about April 29, 2015, LINDSEY accessed MGT's Timberline accounting system and conducted a series of invoice transfers, moving multiple contractor invoices between several MGT projects in order to conceal the true cost of the particular MGT projects that had generated those contractor invoices.

    b. On or about February 1, 2016, Thalhimer's CFO sent an email communication to employees of SunTrust Bank (a financial institution with its deposits insured by the Federal Deposit Insurance Corporation), which provided MGT / Thalhimer with loans and lines of credit. Appended to that email were the company's consolidated, audited 2014 and 2015 financial statements, which were false and fraudulent in light of the defendant's and his co-conspirators' criminal acts.

    c. On or about May 19, 2016, Thalhimer's CFO sent an email communication to a Richmond-based insurance broker working with The Hartford Financial Services Group (THFSG), which provided MGT / Thalhimer with insurance coverage. Appended to that email were the company's consolidated, audited 2014 and 2015 financial statements, which were false and fraudulent in light of the defendant's and his co-conspirators' criminal acts. The following day, that Richmond-based insurance broker emailed Thalhimer's financial statements to a THFSG employee, who uploaded Thalhimer's fraudulent financial statements into THFSG's servers, located at THFSG's headquarters in Hartford, Connecticut.

30. As the result of these and other wirings and communications, employees of the financial institutions and bonding companies described above – acting in reliance on the presumed accuracy and truthfulness of MGT / Thalhimer's financial reporting – agreed to provide the company with loans, lines of credit, and insurance coverage.

31. LINDSEY and his fellow conspirators also worked to conceal the accounting fraud from auditors tasked with evaluating and reporting on MGT Construction's true financial condition and fiscal outlook. When interacting with those auditors, LINDSEY and his co-conspirators would provide WIP reports and other accounting records that those individuals knew contained numerous

misrepresentations about MGT's profitability; likewise, LINDSEY would deliberately omit any mention of the ongoing accounting fraud scheme when discussing MGT's operations and finances.

32. LINDSEY and his fellow conspirators operated this accounting fraud from at least 2011 until LINDSEY's termination from MGT Construction in November 2016. During the course of the conspiracy, LINDSEY moved (or deleted) thousands of invoices, concealing the fact that – by the end of the conspiracy – MGT Construction was at least $28 million in debt.

(All in violation of Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant is hereby notified that upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense charged. If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461; and Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461).

G. Zachary Terwilliger
United States Attorney

By: _____
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219-2447
Phone: (804) 819-5400
Fax: (804) 819-7417